The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr., and the briefs and arguments on appeal. The appealing party has shown good ground to reconsider the evidence. Having reconsidered the entire record of evidence, the Full Commission reverses the prior Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing on 6 May 1999 as:
 STIPULATIONS
1. Issues of jurisdiction, employment relationship, the compensability of repetitive motion injuries to plaintiffs hands and arms prior to April of 1992, the applicable average weekly wage and compensation rate, and the carrier on the risk prior to January 1, 1997 (Universal Underwriters), were previously determined in the Opinion and Award of former Deputy Commissioner Lawrence B. Shuping, Jr., filed 11 January 1994, and the Opinion and Award by the Full Commission of former Commissioner James J. Booker, 15 August 1994, which affirmed the former Deputys award.
2. Universal Underwriters was on the risk for defendant-employer from 2 April 1992 through 3 January 1993.
3. Travelers Insurance Company became the carrier on the risk for defendant-employer from 3 February 1997 through 3 February 1998.
4. The following documents are stipulated into evidence:
 (a) All medical and rehabilitation records related to plaintiffs injuries contained in a tabbed exhibit entitled "Medical Record Index supplied by counsel;
 (b) All earnings records of plaintiff for her part-time employment at Jobbers, Inc., for 1997, and;
 (c) A transcript of plaintiffs tape recorded statement taken on 29 October 1998, by Vickie Crouse of Travelers Insurance Company.
5. The deposition of plaintiffs treating physician, Joel D. Krakauer, M.D., a board certified orthopedic surgeon in Raleigh, taken 25 May 1999, was filed with attached Deposition Exhibits 1-6, and received in evidence.
 ***********
Based upon the entire record of evidence, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff worked as an office manager in defendant-employers auto parts business. In that capacity she worked forty to seventy (40-70) hours per week during the period of 1985 to April of 1992. Plaintiffs daily work activities included the following: receiving telephone orders; keying in orders into a computer; keying price changes and other information into the computer; handwriting telephone orders and other information; filling parts orders, which involved lifting and carrying auto parts of various sizes up to fifty (50) pounds from the shelves in the warehouse to the service desk; conducting inventory in the parts warehouse which involved climbing up on shelves; pulling, lifting and sorting boxed automobile parts; keeping the books and records of the business; and sweeping and cleaning floors, bathrooms and other areas of the warehouse and offices.
2. Plaintiff developed bilateral carpal tunnel syndrome and bilateral synovitis, with degenerative changes to the carpometacarpal joint (thumb), as the result of her employment with defendant between 1985 to April of 1992. Plaintiffs claim for compensation, medical treatment and total disability, was accepted by defendant-employer and its then carrier Universal Underwriters on an Industrial Commission Form 21 Agreement, which was approved by the Commission in 1992.
3. Following a dispute over continuing disability compensation and medical treatment, hearings were held and the Commission ordered reinstatement of plaintiffs benefits.
4. Dr. Joel Krakauer performed surgery on plaintiffs right hand on 25 March 1996 and on her left hand on 25 July 1996. Following recovery from surgery, plaintiff returned to work at Jobbers in February of 1997. Dr. Krakauer limited her to part-time work, generally four to six hours per day, up to thirty hours per week, during which time plaintiff received compensation for partial disability pursuant to G.S. 97-30 from defendant-employer and its carrier Universal Underwriters. Subsequently, plaintiff received ratings for permanent partial impairment to both hands and was compensated by these defendants accordingly.
5. Upon plaintiffs return to work, the auto parts business at Jobbers had diminished such that seven former employees who had worked prior to her medical leave were no longer employed. Following her return to work, plaintiff resumed her normal duties, plus some additional duties made necessary because no other employees were available to assist her.
6. Plaintiff described her additional workload to Dr. Krakauer on 25 March 1997, complaining that she had to do heavy lifting. In a written medical note, Dr. Krakauer limited plaintiff to six hours of work per day until 1 October 1997.
7. At an examination by Dr. Krakauer on 19 September 1997, plaintiff was experiencing and reported parasthesias (numbness) in the ulnar distribution of her right hand and exhibited a positive Tinels sign at the elbow. Significantly, plaintiffs prior history of hand and arm problems included signs of ulnar nerve involvement. Nerve conduction studies showed decreased latency on right in median nerve with and some decreased ulnar sensitivity.
8. At a 3 October 1997 examination by Dr. Krakauer, plaintiff was experiencing a worsening of her symptoms bilaterally. Plaintiff had stopped working due to increased pain and numbness in her hands. Dr. Krakauer did not authorize full medical leave at that time, pending further diagnostic evaluation and ordered EMG testing. Defendants would not authorize this and recommended additional evaluation, so plaintiff requested a hearing. Pending the hearing, further evaluation of her condition was jointly authorized by both carrier-defendants and was performed by Dr. Krakauer on 17 February 1999.
9. On 23 February 1999, plaintiff was diagnosed with cubital tunnel syndrome, a compression neuropathy of the ulnar nerve at the elbow. The condition manifests as numbness and tingling, typically in the small and ring finger, the area of ulnar nerve distribution, with a particular pattern of weakness in the hand, and sometimes with medial elbow pain, and a positive Tinels sign. Tinels sign is a simple physical exam in which a tap over the nerve reproduces a pattern of paresthesia. A tap in the cubital tunnel just posterior to the medial epicondyle can produce paresthesia in the small and ring fingers, thus indicating ulnar nerve involvement. These clinical manifestations were present in plaintiff.
10. Cubital tunnel syndrome is similar to carpal tunnel syndrome except that it is a different nerve in a different location. Carpal tunnel involves the median nerve compressed at the wrist and cubital tunnel affects the ulnar nerve, which becomes compressed or irritated at the elbow.
11. A clinical diagnosis of cubital tunnel syndrome is appropriate notwithstanding negative electrodiagnostic studies because this test is often not reliable. The clinical manifestations of cubital tunnel syndrome can become quite advanced before EMG tests will reflect changes. It is not uncommon for a physician to diagnose cubital tunnel syndrome and to offer surgery for it in the face of a normal nerve test. The nature of the ulnar nerve at the elbow makes it difficult to obtain accurate measurements of conduction speed, as well as the distance, across the elbow. It is a difficult linear measurement to make because of the curve of ones elbow.
12. Although plaintiffs cubital tunnel syndrome was not directly caused by her previous carpal tunnel syndrome, it is related to her past injuries in that the same work activities contributed equally to both conditions. Plaintiffs employment with defendant-employer from 1985 to 1992 initially contributed to the development of carpal tunnel syndrome, and subsequently contributed to the development of cubital tunnel syndrome.
13. The sum total of plaintiffs work activities for defendant-employer as described above from 1985 to 1992, and for approximately seven months in 1997, caused or contributed to the development of her cubital tunnel syndrome and also placed her at an increased risk of developing that condition as compared to members of the general public not so employed.
14. Following recovery from surgery for carpal tunnel syndrome performed in 1996, plaintiff returned to her position with defendant-employer on 5 February 1997. From that date through 22 August 1997, she worked part-time, generally four to six hours (4-6) per day and from twenty to thirty (20-30) hours per week, performing essentially the same tasks she had performed from 1985 until she first became disabled in 1992. By August of 1997, plaintiff was experiencing symptoms that were later diagnosed as cubital tunnel syndrome.
15. Plaintiffs limited work activities from 5 February 1997 through 22 August 1997 contributed, to some degree, to the development of and aggravation of her cubital tunnel syndrome.
16. Although Dr. Krakauer suspected cubital tunnel syndrome on 19 September 1997, and on 3 October 1997, he did not have sufficient information at that time to make a definitive diagnosis or to certify that plaintiff was unable to work. In fact, plaintiffs symptoms on and after 22 August 1997 did not change during the year that intervened before defendants authorized her to see Dr. Krakauer again, at which time he certified her as being unable to return to work. By 22 August 1997, plaintiff was in fact unable to work and earn wages in her former employment because of pain associated with her cubital tunnel syndrome. Dr. Krakauer was unable to confirm the diagnosis until 23 February 1999. At that time, he noted that plaintiffs cubital tunnel syndrome had been present for several years.
17. As a result of cubital tunnel syndrome, plaintiff was unable to earn wages in her former position with defendant-employer or in any other employment after 22 August 1997.
18. Plaintiff continues to experience pain and numbness in her hands and arms caused by her cubital tunnel syndrome, but has not received medical treatment for her condition, although this has been recommended by her authorized treating physician.
19. Plaintiff is in need of medical treatment for her cubital tunnel condition. Ulnar nerve decompression surgery, a medial epicondylectomy, and/or other appropriate surgical procedure by her treating physician, Dr. Krakauer, have been recommended.
20. Plaintiff was last injuriously exposed to the hazards of her disease while employed by defendant-employer during the period of time from 5 February 1997 through 22 August 1997. Defendant-carrier Travelers Insurance Company was on the risk during that period.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs employment with defendant-employer caused or significantly contributed to the development of her cubital tunnel syndrome and exposed her to an increased risk of developing this disease as compared to members of the general public not so employed. G.S. 97-53(13).
2. Plaintiff was last injuriously exposed to the hazards of her disease while employed by defendant-employer during the period of time from 5 February 1997 through 22 August 1997 when defendant-carrier Travelers Insurance Company was on the risk. G.S. 97-57.
3. As a proximate result of her occupational disease, plaintiff is entitled to be paid by defendant-carrier Travelers Insurance Company ongoing total disability compensation at the rate of $403.33 per week for the period of 23 August 1997 through the present and continuing until such time as she returns to work or until further order of the Commission. G.S. 97-29.
4. As the result of her occupational disease, plaintiff is entitled to have defendant-carrier Travelers Insurance Company pay for all related medical expenses. G.S. 97-25.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant-carrier Travelers Insurance Company shall pay to plaintiff temporary total disability compensation at the rate of $403.33 per week for the period 23 August 1997 through the present and continuing until such time as she returns to work or until further order of the Commission. The compensation which has accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorneys fee approved herein.
2. Defendant-carrier Travelers Insurance Company shall pay all medical expenses incurred which are related to plaintiffs occupational disease.
3. A reasonable attorneys fee of twenty-five percent (25%) of the compensation awarded above is approved for counsel for plaintiff. From the amounts having accrued, this fee shall be deducted from the compensation due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendant-carrier Travelers Insurance Company shall pay the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/______________ RENE C. RIGGSBEE COMMISSIONER